

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| | § | |
| MANUEL CARRASCO-FLORES AKA NELSON FLORES-CARRASCO, | § | No. 08-13-00232-CR |
| Appellant, | § | Appeal from |
| | § | 362nd District Court |
| v. | § | of Denton County, Texas |
| THE STATE OF TEXAS, | § | (TC # F-2012-2661-D) |
| Appellee. | § | |

## O P I N I O N

In this aggravated assault case Appellant contends the trial court erred in failing to charge the jury with a self-defense instruction. For the reasons set out below, we reverse and remand for a new trial.[1]

## FACTUAL SUMMARY

Appellant was charged with aggravated assault for stabbing Osman Matute-Gomez. The trial included a related capital murder charge for the death of Norma Gomez, Osman's mother. The jury returned a guilty verdict on both the capital murder charge and aggravated assault charge. The trial court assessed the statutorily required life without parole sentence for the capital murder, and a twenty year sentence on the aggravated assault. In the related appeal

---

[1] This case was transferred from our sister court in Fort Worth pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX.GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedents of the Fort Worth Court of Appeals to the extent they might conflict with our own. *See* TEX.R.APP.P. 41.3.

involving the capital murder, we have set out all the relevant facts for the case. Here, we recite only those facts germane to the single issue before us.

Appellant is described throughout the record as either Norma's boyfriend or common law husband. He had been seeing her for about three years. Three to four months before the murder, Appellant and Norma moved in together at the Basswood Manor Apartments. Appellant contends the apartment was put under Norma's name because he could not read or write, but he paid the rent. Appellant claimed he signed a lease, but the apartment's record show only Norma's signature on the lease and related disclosure documents. Appellant was listed as an "occupant."

Norma's seventeen-year-old son, Osman, was also sharing the apartment. He never liked Appellant and tried to get him to leave. There was undisputed testimony that about a week prior to the murder, Osman told Appellant's brother that if he did not come for Appellant, Osman would kill Appellant. Appellant recalled another instance where Osman told him to stay out of his life or else he was going to "knife" him. Norma told Appellant about three days prior to the murder that Osman had once put a knife to Appellant's neck as he was sleeping, but Norma coaxed him out of following through.

The jury heard two differing accounts of the events on the morning of the murder. The version most favorable to the verdict suggests that Norma awoke and sent Osman off to school. She was in the kitchen making breakfast. Appellant walked in and asked what she was making him for lunch and she told him to make his own lunch. That started an argument leading to Appellant grabbing a kitchen knife and threatening her. She reached for her cell phone, but he grabbed it told her she was not calling anybody. He then showed her some sort of image of a gun on the cell phone and threatened to kill her. He took the knife and stuck it into an air

mattress that was on the floor of the living room. A downstairs neighbor heard the argument and what sounded like Appellant using the word "regret."

Norma then ran out of the apartment and across the street to where she knew police officers were routinely stationed for traffic enforcement. An officer called a regular patrol unit which took Norma's report of events. The responding officers found Norma crying, scared, and she appeared shaken. They noted she had bruises on her arm. The officers went into the apartment and found it empty. They found a knife on the kitchen counter, but did not see the air mattress.

By this time, Norma's boss and friend, Idalia Mata, arrived. While Norma and Mata were talking to the officers, Mata received a call on her cell phone from Norma's cell phone, which Appellant had apparently taken with him. An officer told Mata to put the call on speaker phone. She answered, and the caller identified himself as Appellant. He asked to speak to Norma. Norma told Appellant she did not want him back in the apartment. Appellant responded that Norma would have to leave. The two continued to argue, and when the officer took the phone and identified himself as a police officer, Appellant disconnected the call.

The officer called the number back several times and Appellant finally answered. The officer asked Appellant to return to the apartment so he could obtain his side of the story. Appellant declined saying he was working and was on his way out of town. Appellant would not say where he was, and the officer finally told him "not to come back to the apartment." The officer suggested that Norma leave the apartment and stay with friends or family. When she refused, an officer went to the leasing office to check the lease and investigate changing the locks.

Appellant's version of these events was far different. He agreed they had a fight, but it stemmed from Norma's jealously over a young woman at the apartment complex who would try and talk to Appellant. He claimed that as he left for work, Norma said she was not going to allow him to be with another woman and would rather call the police and have him deported to Honduras. He acknowledged taking her phone. His brother, Jose Flores[2], picked him up about 7:20 am to drive him to work. When he heard his brother honk the horn from the parking lot, he left the apartment and knew nothing about Norma walking across the street to flag down an officer. Jose recalled seeing Norma and Appellant leave the apartment at the same time. He described her as crying and his brother was "sad." When Appellant entered Jose's car, Jose saw Norma walk across the street to talk to a policeman. Both brothers then exited Jose's vehicle and climbed into a co-worker's vehicle. They all then left for their jobsite. Appellant agreed that he later spoke with a person on the phone who identified himself as a police officer.

After the police left, Norma and Mata went to the leasing office to arrange for changing the locks. Norma asked that Appellant be removed from the lease and that her son be added. Norma paid the fee to accomplish the paperwork change and the locks were changed that morning. She dropped the new key at her son's school and then went to work. She finished work at 5 pm and Mata dropped her off at the apartment.

During the course of the day, Appellant called Mata's phone and left several voice mail messages. In one, he asked her to tell Norma to give him back all of his things, or if she wanted to keep his belongings, she could pay him a $1,000. In another, he suggested their argument was over his drinking beer on Saturday and he asked Mata to tell Norma he loved her. He also said that "everyone is angry" that Norma called the police and "she should not have done that." In yet another, Appellant sounded as if he were crying and apologizing for the fight that morning.

---

[2] We likewise refer to Appellant's brother by his given name, Jose.

Appellant also recalled talking with Norma about four times that day, but these conversations were more like arguments. In one, she told him to pick up his things. But according to Jose, Appellant related to his co-workers that Norma had agreed to give him another chance.

There are also several versions of the details of the murder. We begin with the evidence supporting of the jury's verdict. Part of the State's version comes from Osman's testimony. Osman arrived home from school about 4 p.m. and Norma got home from work about 6 p.m. Osman secured both the lock on door knob and the inside deadbolt. Later, he heard someone trying to use a key to get in and saw Appellant through the peephole. Appellant started knocking hard at the door and when that did not get a response, he kicked in the door. A crime scene photograph shows the door frame broken with the door locks still engaged.

Appellant was upset that they had not opened the door. He asked Norma why she had gone to the police. Norma told him to get his belongs. He asked for his television which Osman went to get. As Osman left, he heard a "thud" behind him and turned to see Appellant striking Norma and then throwing her to the floor. Appellant got a knife from the kitchen and stabbed Osman in the chest. He then stabbed Norma. Osman went to the bedroom to find something he could use as a weapon. He returned with a ceramic ornament and broke it on Appellant's head while Appellant was on top of Norma. He pulled Appellant off his mother. She fled the apartment first with Osman running after her. Norma collapsed near the bottom of the stairs and Osman was just barely out the door when he fell. Osman saw Appellant go down the stairs and then stab his mother several more times.

The State also relied on an independent eye-witness, Carlos Dominguez, who lived downstairs. He heard shouting and went outside to check on his own daughter. He then saw

5

Norma stumble down the stairs. Appellant followed shortly thereafter with a knife in his hand and stabbed Norma several more times. Osman then came out of the apartment and collapsed, holding an apparent wound. Dominguez could not see any injuries on Appellant at that time. Appellant went towards his brother who was waiting in a vehicle in the parking lot. Appellant and Jose then began fighting over the knife. Jose got the knife and threw it away, and the pair left in Jose's car. The knife was found sticking into the ground across from the parking lot.

And part of the State's case came in through Jose, who recanted some of his statements to the police the night of the stabbing. Jose had dropped his brother off from work and was in the parking lot. Two minutes later, Appellant called him in tears, asking if he was still there. Three to four minutes later, Appellant came from the apartment. Jose had told a police officer that he saw his brother stabbing himself. He also reported that he then got out of his car and tried to get the knife away from his brother. Appellant told him that he would rather die than go to jail. He also admitted that "he hurt or killed the woman, and that the devil told him to do it." At trial, however, Jose only recalled seeing a knife stuck in his brother's chest. He did not recall trying to stop his brother from killing himself. Instead, he pulled the knife out, threw it away, and then took Appellant to the hospital.

The jury also heard Appellant's version of events from a taped interview made at the hospital that night, from various hearsay statements made by Appellant at the hospital, and from Appellant's trial testimony. We summarize each separately.

Jose drove his brother from the apartment complex to the hospital. Appellant had a stab wound to the upper quadrant of the left chest and cut wounds on his right hand. He told his brother his hand was cut when he got the knife away from Osman. While he was wrestling the

6

knife away from Osman, Norma was "striking" Appellant and she had hit him over the head with a flower vase, causing bleeding and swelling.

While at the emergency room, a detective and officer interviewed Appellant. He was read his Miranda rights and agreed to talk to the officers. He told them that Osman had stabbed him in the hand and chest. At one point in the struggle, Norma got between the two and Osman stabbed her in the chest. He claimed Osman was a "crackhead" and "using rock." Appellant at one point used Norma as a shield to block Osman from stabbing him. When pressed to tell the truth, Appellant admitted that he actually stabbed Norma and killed her. At other times, however, he denied that anything happened to Norma. He also claimed that Norma stabbed him. The officer finally told Appellant that Norma was dead and Appellant became nearly hysterical, saying that the devil was in him and made him do it. He then terminated the interview. Another officer at the hospital recounted several statements from Appellant, all relayed to him by a Spanish-speaking nurse.[3] Appellant was repeating that he did not know, or could not believe, what he did, and saying he was sorry while also yelling "diablo." This same nurse related to the officer that Appellant had been locked out of his apartment and had kicked in the door. He began arguing with Norma and "Norma stabbed him in the chest while her son Osman hit him in the head." He grabbed the knife and "stabbed both Osman and Norma in self-defense."

Appellant's testimony at trial was somewhat different. He intended to get his possessions and rent a room for himself, though he hoped to talk with Norma. When he tried the key in the door, it would not work and he knocked. The door "was opened to me, I don't know who did [sic]." He later testified that Norma opened the door. Norma asked what he wanted, and he asked for his clothes and a chance to use the bathroom. He then saw Osman with his hand

---

[3] Appellant speaks only Spanish and several of the officers spoke only English.

7

behind his back holding a knife. There was a trash sack with his clothes and she told him to pick up his belongings quickly "because the officers were going to arrest me."

Appellant then claimed that Osman attacked him by swinging the blade and his mother intervened. Appellant was unsure if Osman cut his mother but he cut Appellant's hand as he tried to defend himself. Appellant also told the jury that "they" had locked the front door. During this exchange, Appellant claimed that Osman stabbed him in the chest but he could not remember what happened after that. He did not recall stabbing either Osman or Norma. While he did recall going toward his brother with the knife stuck in his chest, and he thought this was just after Osman had stabbed him.[4] He also recalled Osman verbally threatening to kill him. He did not recall being hit over the head. He did not recall the drive to the hospital, or anything that was said at the hospital.

Norma suffered eleven stab wounds, including two with entry points in her back. She had what appeared to be defensive wound on her hands. The coroner determined that some the wounds were potentially lethal, but could not identify which one in particular lead to her death. The coroner could not determine the order in which the wounds were made, nor could she exclude possibility the wounds were made by more than one person. Norma died of exsanguination due to multiple stab wounds. Appellant had diagonal cuts across the inside of his index, middle, and ring finger of the right hand. These would have been consistent with injuries from his hand sliding down the knife from the handle onto blade as he stabbed with the knife. Osman had a stab wound to the upper quadrant of his left chest and a laceration on his right bicep.

---

[4] This sequencing is implausible in light of Dominguez's testimony that Appellant stabbed Norma several times at the bottom of the stairs while Osman collapsed at the top of the stairs. Appellant testified at trial that Norma left the apartment first and he next, with the knife stuck in him. Unless there were two knives, of which there is no evidence, he could not have had the knife stuck in his chest at the same time used it to stab Norma several more times as he fled down the stairs.

8

Appellant raises a single issue on appeal in which he faults the trial court for failing to include a charge on self-defense, contending that while the testimony may have been conflicting, there was testimony supporting the defense.

## STANDARD OF REVIEW

Appellate review of alleged jury charge error involves a two-step process. *Kirsch v. State,* 357 S.W.3d 645, 649 (Tex.Crim.App. 2012); *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex.Crim.App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984)(op. on reh'g). First, we must determine whether error occurred. *Wooten v. State,* 400 S.W.3d 601, 606 (Tex.Crim.App. 2013); *Abdnor*, 871 S.W.2d at 732. When determining whether the charge is erroneous, we consider it "as a whole instead of a series of isolated and unrelated statements." *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex.Crim.App. 1995). If there is error in the charge, we must then analyze whether sufficient harm resulted from the error to require reversal. *Wooten,* 400 S.W.3d at 606.

Under this second step, the degree of harm necessary for reversal usually depends on whether the appellant properly preserved the error by objection. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex.Crim.App. 2003). If the appellant objected to the charge error, we determine whether there is "some harm." *Sakil v. State*, 287 S.W.3d 23, 25-26 (Tex.Crim.App. 2009). The Court of Criminal Appeals has interpreted that standard to mean that "any harm, regardless of degree, is sufficient to require reversal." *Druery v. State*, 225 S.W.3d 491, 504 (Tex.Crim.App. 2007). If the appellant did not object we will not reverse unless the record demonstrates "egregious harm." *Sakil*, 287 S.W.3d at 26. Here, Appellant's counsel objected to the omission of a self-defense instruction.

Regardless of which reversible error standard applies, we look to the four factors outlined in *Almanza v. State* to analyze the impact of any error. "In both situations the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." 686 S.W.2d at 171.

## SELF-DEFENSE INSTRUCTION

Appellant complains that the trial court refused to include an instruction on self-defense. A trial judge must give a requested instruction on every defensive issue raised by the evidence without regard to its source, its strength, or whether it is contradicted or credible. *Juarez v. State*, 308 S.W.3d 398, 404-05 (Tex.Crim.App. 2010)(defendant's conflicting statements did not negate duty of the trial judge to submit defense); *Shaw v. State,* 243 S.W.3d 647, 657-58 (Tex.Crim.App. 2007). The defendant's only burden is to present that minimum quantity of evidence sufficient to support a rational jury finding each element of the defense. *Shaw*, 243 S.W.3d at 658 ("a defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true."); *Granger v. State*, 3 S.W.3d 36, 38 (Tex.Crim.App. 1999). This rule preserves the jury's role as the arbiter of the credibility of the witnesses. *Miller v. State*, 815 S.W.2d 582, 585 (Tex.Crim.App. 1991)(op. on reh'g).

The initial burden to produce evidence supporting a claim of self-defense is on the defendant. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex.Crim.App. 2003). But once the defendant produces some evidence, the State bears the ultimate burden of persuasion to disprove the raised defense. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex.Crim.App. 1991). The issue of self-defense is a fact issue to be determined by the jury, which is free to accept or reject any defensive evidence on the issue. *Id.* at 913-14.

10

Self-defense is statutorily defined. TEX.PEN.CODE ANN. § 9.31 (West 2011) provides that a "person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id*.[5] The defense can turn on the defendant's conduct. For instance, one cannot claim self-defense if he has provoked another's use or attempted use of unlawful force unless "the actor abandons the encounter, or clearly communicates to the other his intent to do so" and "the other nevertheless continues or attempts to use unlawful force against the actor." *Id*. at § 9.31(4). When the defense applies, a person is justified in using deadly force "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." *Id*. at § 9.32(a)(2)(A).

Self-defense is also one of the confession and avoidance defenses. *Shaw*, 243 S.W.3d at 657-58. Under such a defense, one must admit to the underlying criminal act, the culpable mental state, and then raise the defense as justification for their conduct. *Id* at 658; *Ex parte Nailor*, 149 S.W.3d 125, 133 (Tex.Crim.App. 2004)(defendant who contended at trial that victim was injury by accident had not confessed to elements of offense and could not raise self-defense).

After the State rested, the trial judge expressed skepticism about the self-defense theory. After Appellant testified, the trial judge rejected the instruction because Appellant had not admitted to the offense. We agree with Appellant that with respect to the aggravated assault charge, there was some evidence to support inclusion of the defense. Based on his many contradictions, a jury might well have rejected his defense, but that was for the jury to decide.

---

[5] Under certain circumstances, not applicable here, an actor's belief that force was necessary is presumed. *Id*. at § 9.31(a)(1)-(3).

Appellant's trial testimony certainly does not fully establish the defense. At trial, he recalled only those details up to the point that he wrestled the knife away from Osman, and he claimed to have forgotten everything after that point. But his trial testimony would permit a jury to infer, if it so chose, that he was peaceably let into the apartment and did not provoke Osman. It was Osman who had a knife and then tried to slash him, and did cut his hand. Appellant also testified that he was let into the apartment and the door was locked behind him. His trial testimony also supported the claim that Osman had threatened him three times before, two times with a knife. From this, a jury might conclude that he had a reasonable belief that deadly force was necessary to protect himself.

The jury also had before it Appellant's out of court statements made at the hospital as related by his brother and the police officers. These statements would be sufficient to allow the jury to infer that Appellant was admitting to all of the elements of the underlying offense, at least with respect to stabbing Osman. He told his brother his hand was cut when he got the knife away from Osman. He claimed that Osman had stabbed him in the hand and chest. He then grabbed the knife and stabbed Osman. We readily concede that Appellant's version of events at the hospital is conflicting. But under the established case law, our role is not to resolve these conflicts. *Juarez v. State*, 308 S.W.3d at 404-05 (defendant's conflicting statements did not negate duty of the trial judge to submit defense); *Shaw*, 243 S.W.3d at 657-58.

Having found error, we next consider whether it was harmful. Looking to each of the four factors identified in *Almanza*, we conclude the absence of the self-defense instruction was harmful. 686 S.W.2d at 171. Considering the charge as a whole, there is no other instruction which would excuse Appellant's conduct based on his reaction to Osman attacking him. Rather, the jury would be compelled to find him guilty if they believed that he intentionally, knowingly,

or recklessly caused serious bodily injury to Osman with a knife. But this is precisely what someone would justifiably do if they were acting in self-defense and were confronted with deadly force. Without the self-defense instruction, Appellant had no defense at all.

For this reason, the denial of a confession and avoidance type of instruction is generally deemed harmful. *See, e.g., Vasquez v. State,* 830 S.W.2d 948, 951 (Tex.Crim.App. 1992) (omission of instruction on necessity defense harmful); *Miller v. State,* 815 S.W.2d 582, 586 (Tex.Crim.App.1991)(omission of instruction on mistake-of-fact defense harmful); *Hill v. State,* 765 S.W.2d 794, 797-98 (Tex.Crim.App.1989)(omission of instruction on mistake-of-fact defense harmful); *Johnson v. State,* 271 S.W.3d 359, 368-69 (Tex.App.--Beaumont 2008, pet. ref'd)(omission of self-defense instruction harmful). In 2013 the Court of Criminal Appeals noted that its survey of case law up to that point found no cases in which "the omission of a defensive instruction under a confession and avoidance theory to be harmless." *Cornet v. State*, 417 S.W.3d 446, 451 (Tex.Crim.App. 2013). *Cornet* held the omission of a "medical-care defense" harmless, but principally because the jury's finding to a related charge necessarily negated the factual basis for the defense. *Id*. at 452.

The evidence on self-defense was conflicting. Both Osman and Appellant claimed the other pulled the knife first and attacked each other first. Appellant's version was disjointed in the sense that part of the story came from his trial testimony, and part from hearsay statements at the hospital, but it was for the jury to decide if those pieces could be woven into a convincing whole. Appellant's version was at least bolstered by three prior threats made by Osman, two of which involved a knife. And while Appellant's version of events at the hospital was conflicting, one common thread was that Osman first started the violence.

The argument of counsel throughout the trial also suggests some harm to Appellant from the absence of the instruction. Appellant's counsel had worked self-defense into his questioning of several witnesses. But once the instruction was taken away, Appellant was left with essentially nothing left to argue in the guilt innocence phase of the trial. The State's prosecutor drove this point home at the outset of his closing statement when he told the jury "[t]hose things are not in here for you to consider; for example, there is no place in any of them, that says self-defense. You're not allowed to consider self-defense. . . . It's not a debate for you to have."

In the related appeal involving Norma, we affirmed the conviction and rejected a claim that the jury should have been instructed on self-defense. We distinguish between Norma and Osman based on the record before us. As to Norma, there was no development of facts to explain why Appellant would have stabbed Norma in her apartment, and much less as she lay incapacitated on the staircase. With regard to Osman, however, there was some evidence to support the defense. For these reason, we sustain Issue One and reverse and remand for a new trial.

May 14, 2015

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Do Not Publish)

14